Daniel B. Pasternak (SBN 023751)
SQUIRE PATTON BOGGS (US) LLP
2325 East Camelback Road, Suite 700
Phoenix, AZ 85016
Telephone:   602.528.4000
Facsimile:   602.253.8129
daniel.pasternak@squirepb.com

Manuel F. Cachán*
William C. Rose*
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
Telephone:   310.557.2900
Facsimile:   310.557.2193
mcachan@proskauer.com
wrose@proskauer.com

Hena M. Vora*
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Telephone:   212.969.3000
Facsimile:   212.969.2900
hvora@proskauer.com

Sara Van Hofwegen*
Joel Frost-Tift*
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, CA 90005
Telephone:   213.385.2977
Facsimile:   212.385.9089
svanhofwegen@publiccounsel.org
jfrost-tift@publiccounsel.org

*Attorneys for Plaintiffs*
*\* Pro hac vice applications forthcoming*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| J.P. and L.C.,<br><br>                    Plaintiffs,<br><br>        vs.<br><br>United States of America,<br><br>                    Defendant. | No.<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# INTRODUCTION

1.       This action seeks damages for the trauma suffered by a mother and child who fled to the United States seeking asylum, and became victims of the United States Federal Government's ("U.S. Government") unlawful and cruel Family Separation Policy.  At the time of the separation, the child was 16 years old and had never spent a single night away from her mother.

2.       Plaintiffs J.P. and L.C.[1] are a mother and daughter who are indigenous women of Mayan descent and citizens of Guatemala.  Before fleeing their home country, neither had ever traveled outside their Mayan village.  J.P. spoke only a Mayan language called Q'eqchi' and could not read or write in any language.  Her daughter, L.C., communicates in Spanish and Q'eqchi'.  Once they left their village, J.P. was entirely dependent on her daughter for communication.

3.       J.P. and L.C. fled Guatemala to escape severe violence.  When they left their country in early May of 2018 to seek safety in to the United States, J.P. and L.C. knew their journey to reach the U.S. border would be dangerous, but they had no idea that the greatest peril would be found once they were apprehended by U.S. immigration officers.  Their entry to the United States came just as the U.S. Government expanded a brutal policy to separate families seeking asylum, without making any plan to reunite these families, or even tell the family members what had become of one another.

4.       Shortly after J.P. and L.C. crossed into the United States from Mexico, U.S. Customs and Border Patrol ("CBP") officers detained the pair in Arizona.  About three days later, CBP officers came to separate J.P. from her child.  The officers did not communicate in a language that J.P. could understand, so she had no idea why she was being separated from her daughter or if she would ever see her daughter again.  L.C. was terrified and clung to her mother when the officers came to separate the pair.  L.C. screamed as agents took her from her mother and, soon after, fainted, injuring her face as she fell onto a concrete floor.  J.P. saw blood on her daughter's mouth as L.C. was taken away.

---

[1] Plaintiff will file a separate motion to proceed with pseudonyms.

5.      L.C.'s forcible separation from her mother was part of a cruel and inhumane policy instituted by the U.S. Government that was intended to deter Central American families from seeking asylum in the United States, depriving them of their rights to seek protection under the Immigration and Nationality Act.  *See* 8 U.S.C. § 1158.

6.      Starting in 2017, the U.S. Government forcibly separated thousands of children from their parents, including Plaintiffs.  This unlawful policy was implemented without any effective procedure for tracking children after they were separated from their parents, enabling communication between parents and their children after separation, or reuniting separated parents and children.  *See L. v. U.S. Immig. & Customs Enf't,* 310 F. Supp. 3d 1133, 1144 (S.D. Cal. 2018), *modified on other grounds*, 330 F.R.D. 284 (S.C. Cal. 2019).

7.      In total, the U.S. Government has acknowledged that it has separated at least 3,800 children from their parents or guardians after they crossed the southwestern U.S. border.[2]  Additional U.S. Government reporting indicates that the number of families separated likely is much higher.[3]

8.      J.P. and L.C. remained forcibly separated for nearly two months.  For over a month, J.P. had no idea where her daughter had been taken or if she would ever see her again.  Officers failed to provide J.P. with any information about her own status or her daughter's whereabouts.  J.P. experienced extreme terror and feared for her daughter's safety.  Similarly, L.C. did not know if she would ever reconnect with her mother.  Officers

---

[2] Joint Status Report at 1, 10, *L. v. U.S. Immig. & Customs Enf't*, No. 18-cv-00428 DMS MDD (S.D. Cal. Sept. 11, 2019), ECF No. 465 (the U.S. Government acknowledged that, for the original class, as many as 2,814 children were separated from their parents and has so far acknowledged an additional 986 children as part of the expanded class); *see also* OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HEALTH & HUMAN SERVS., OEI-BL-18-00511, SEPARATED CHILDREN PLACED IN OFFICE OF REFUGEE RESETTLEMENT CARE 11 (Jan. 17, 2019), https://oig.hhs.gov/oei/reports/oei-BL-18-00511.pdf [hereinafter HHS OIG REPORT I].

[3] *See* HHS OIG REPORT I, *supra* note 2, at 1, 6, 13 (reporting that "thousands of children may have been separated . . . before the accounting required by the Court [in *L.*, 310 F. Supp. 1133]").

2

informed L.C. that she had no right to be in the U.S. and that her mother would be deported. L.C. became terrified J.P. would be sent away before they were reunited.

9.     It was only after J.P. retained pro bono counsel, more than a month after being separated from her daughter, that she learned what had become of L.C.

10.     On July 16, 2018, J.P. and L.C. were finally reunited after extensive advocacy by their legal team.

11.     As a result of being forcibly separated for two months, L.C. suffered physical injury and both J.P. and L.C. suffered, and continue to suffer, extreme emotional distress. Plaintiffs bring this action under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2671, *et seq.* ("FTCA"), seeking compensation for the extraordinary harms they suffered due to the U.S. Government's tortious conduct.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1346(b)(1), and the FTCA, 28 U.S.C. §§ 2671-2680.

13.     On May 14, 2020, J.P. and L.C. submitted administrative claims to CBP, the U.S. Department of Homeland Security ("DHS"), U.S. Immigration and Customs Enforcement ("ICE"), and the U.S. Department of Health and Human Services ("HHS"). None of the agencies has made a final disposition on either J.P. or L.C.'s administrative claim.  Because six months have passed since the submission of those claims, they are deemed finally denied.  28 U.S.C. § 2675(a).  J.P. and L.C. have therefore exhausted all potential administrative remedies.

14.     Venue is proper in this District under 28 U.S.C. § 1402(b) because the acts and omissions that give rise to this action took place in this judicial district.  J.P. and L.C. were separated in San Luis, Arizona.

## PARTIES

15.     J.P. and L.C. are Guatemalan nationals who currently reside in the United States.  In 2018, they fled together to the United States seeking asylum.

16.    J.P. and L.C. were forcibly separated while detained at a CBP facility in Arizona.    At the time, L.C. was 16-years-old.    Today, she is 20-years-old.    After the separation, federal agents moved J.P. to an ICE detention facility in Irvine, California, and moved L.C. to an Office of Refugee Resettlement ("ORR") facility in Phoenix, Arizona. The pair were separated from approximately May 20, 2018 through July 16, 2018, a total of eight weeks.

17.    Defendant the United States of America is the appropriate defendant under the FTCA.    28 U.S.C. §§ 1346(b), 2671, *et seq*.

18.    Defendant acted through DHS and HHS, which are "federal agencies" of the United States under 28 U.S.C. § 2671, and their employees, officers, and agents, including but not limited to CBP and ICE, subcomponent agencies of DHS that are under the direction, authority, and control of the Secretary of Homeland Security; and the ORR, a subcomponent agency of HHS that is under the direction, authority, and control of the Secretary of Health and Human Services.

19.    The federal officers referenced in this Complaint were at all relevant times employees of the United States, working within the scope and course of their employment with the federal agencies listed above.

20.    DHS employees were responsible for separating J.P. and L.C.    DHS employees were also responsible for supervising and managing detained individuals at CBP and ICE facilities, including those located in Arizona—where J.P. and L.C. were detained and separated—and California, where J.P. was detained after being separated from her daughter.

21.    HHS employees were responsible for supervising and managing the detention of children classified by the U.S. Government as unaccompanied, including those children at the Arizona facility where L.C. was detained after she was separated from her mother.

22.    High-ranking officials from DHS and HHS worked together to design and promulgate the unlawful Family Separation Policy that caused J.P. and L.C. extreme harm.

23.     At all relevant times, all DHS employees referenced in this Complaint who interacted with J.P. and L.C. were acting as investigative or law enforcement officers.  28 U.S.C. § 2680(h).

## STATEMENT OF FACTS

### A.    Family Separation Policy

#### 1.    The Development of the Separation Policy and Defendant's Intent to Deter Future Central American Asylum Seekers by Causing Trauma

24.     Limiting the number of individuals seeking asylum in the United States was a central focus of the Trump administration's immigration policy.[4]

25.     The laws of the United States permit non-citizens on U.S. soil to seek asylum and related humanitarian relief regardless of how, or where, or with whom they arrive at the U.S. border.[5]  Those persons like Plaintiffs who enter the United States outside a port of entry may be subject to expedited removal, a process under which an individual may be removed from the U.S. without a full hearing before an immigration judge.  *See* 8 U.S.C. § 1225(b)(1)(A)(i).

26.     Federal law provides safeguards designed to protect asylum-seekers.  Generally, an individual who indicates an intention to seek asylum or a fear of persecution if returned to their home country must first be referred to an asylum officer to determine if she has a credible fear of persecution.  8 U.S.C. § 1225(b)(1)(A)(ii).  If the officer determines that the individual has established a credible fear, she is placed into removal

---

[4] *See*, *e.g.*, *U.S. Judge Bars Trump Administration From Enforcing Asylum Ban*, CNBC (Nov. 20, 2018, 2:04 AM), https://www.cnbc.com/2018/11/20/immigration-policy-judge-bars-us-from-enforcing-trump-asylum-ban.html; Shaw Drake & Edgar Saldivar, *Trump Administration Is Illegally Turning Away Asylum Seekers*, ACLU (Oct. 30, 2018, 1:30 PM), https://www.aclu.org/blog/immigrants-rights/trump-administration-illegally-turning-away-asylum-seekers.
[5] *See* 8 U.S.C. § 1158(a)(1) (asylum); 8 U.S.C. § 1231(b)(3); Convention Against Torture, 8 U.S.C. § 1231 note (United States Policy with Respect to the Involuntary Return of Persons in Danger of Subjection to Torture); 8 C.F.R. § 208.1(a).

proceedings and can then file an asylum application. 8 U.S.C. § 1225 (b)(1)(B)(ii); 8 C.F.R. § 235.6(a)(1)(ii), (iii).

27.  Alternatively, the U.S. Government can place an asylum seeker directly into removal proceedings through the issuance of a Notice to Appear for a future hearing date. *See* 8 U.S.C. §§ 1225(b)(2), 1229(a). There is no law requiring the detention of asylum seekers or the prolonged separation of families.

28.  If the U.S. Government chooses to detain children, it must comply with the *Flores* Settlement regardless of whether the children arrive unaccompanied or with their families. *Flores v. Lynch*, 828 F.3d 898, 901 (9th Cir. 2016). Under the *Flores* Settlement, the U.S. Government is required to treat "minors in its custody with dignity, respect and special concern for their particular vulnerability."[6] Further, the U.S. Government must "hold minors in facilities that are safe and sanitary and . . . consistent with . . . the particular vulnerability of minors."[7] Any such facility in which minors are held by the U.S. Government following arrest must provide for "contact with family members who were arrested with the minor."[8]

29.  Defendant sought to prevent asylum seekers from coming to the United States by implementing what is now known as the Family Separation Policy. The Family Separation Policy was developed and implemented to intentionally separate immigrant families arriving at the southern border for the express purpose of causing those families emotional harm.

30.  Defendant developed and implemented the Family and Separation Policy knowing it would cause extreme trauma to vulnerable families who had fled to the United States seeking refuge. Prior to its enactment, high-level U.S. Government officials had warned of the severe harm which would be caused by immigration policies that separated children from their parents. A 2016 DHS Advisory Committee flatly concluded that "the

---

[6] Stipulated Settlement Agreement ¶ 11, *Flores v. Reno*, No. 85-CV-4544 (C.D. Cal. Jan. 17, 1997).
[7] *Id.* ¶ 12.
[8] *Id.*

separation of families for purposes of immigration enforcement or management, or detention is never in the best interest of children" and that "[f]amily separation in these circumstances raises serious concerns and violates the best interests of the child—which requires prioritizing family integrity and the maintenance of emotional ties and relationships among family members."[9]

31.     Notwithstanding this knowledge, high-ranking federal officials from ORR, the Department of Justice ("DOJ"), CBP, and ICE met at the office of the CBP Commissioner in February of 2017 to consider a policy of separating asylum-seeking parents from their children.[10]  Commander Jonathan White, a high ranking HHS official and then Deputy Director of ORR's Unaccompanied Children program, attended the meeting and warned policy-makers that the proposed plan to separate families seeking asylum would likely harm the children of those families.  In 2018, he testified before the Senate Judiciary Committee and confirmed that he had raised concerns about the impact of the then-proposed Family Separation Policy on children.  He acknowledged "[t]here's no question that separation of children from parents entails significant potential for traumatic psychological injury to the child."[11]

32.     News that DHS was considering using family separation as a deterrence policy was met with instant backlash from the medical community.  The American Academy of Pediatrics ("AAP"), one of many respected organizations to oppose the Family

---

[9] U.S. IMMIGR. & CUSTOMS ENF'T, DEP'T OF HOMELAND SEC., REP. OF THE DHS ADVISORY COMMITTEE ON FAMILY RESIDENTIAL CENTERS 2, 10 (2016), https://perma.cc/TZ9C-CUMC.

[10] *Examining the Failures of the Trump Administration's Inhuman Family Separation Policy: Hearing Before H. Comm. on Energy & Com., Subcomm. on Oversight & Investigations* 1006-1024; 1131-1138 (Feb. 7, 2019) (testimony of Commander Jonathan White, U.S. Public Health Service Commissioned Corps, U.S. Dep't of Health & Human Servs.), https://perma.cc/F2EV-ZS9W ("Subcomm. on Oversight & Investigation Hearing").

[11] *Id.*; *see also* Jeremy Stahl, *The Trump Administration Was Warned Separation Would be Horrific for Children, Did It Anyway,* SLATE (July 31, 2018, 5:05 PM), https://slate.com/news-and-politics/2018/07/the-trump-administration-was-warned-separation-would-be-horrific-for-children.html.

Separation Policy, warned of the damage to "vulnerable, scared children" and therefore urged policymakers to "exercise caution to ensure that the emotional and physical stress children experience as they seek refuge in the United States is not exacerbated by the additional trauma of being separated from their siblings, parents or other relatives and caregivers."[12]

33.     The concerns of Commander White and medical experts were met by repeated assurances by the then-Director of ORR that "there was no policy that would result in the separation of children and parent" and that, accordingly, the U.S. Government's unaccompanied children program need not plan for a continued increase in the number of children separated from their parents.[13]

> **2.     After Piloting Family Separation in 2017, the United States Launched a Full-Scale Policy of Separating Parents from Their Minor Children in April 2018.**

34.     Despite assurances from Secretary of Homeland Security John Kelly to Congress in April 2017 that families crossing the border would only be separated in specific circumstances and for the welfare of the child, by March of that year the U.S. Government had already begun seriously considering its Family Separation Policy.[14]

35.     Between July and November 2017, the U.S. Government operated a pilot version of the Family Separation Policy in CBP's El Paso sector ("Pilot Program").[15]   The

---

[12] Fernando Stein & Karen Remley, *AAP Statement Opposing Separation of Mothers and Children at the Border*, AMERICAN ACADEMY OF PEDIATRICS (Mar. 4, 2017), https://perma.cc/AZ5Q-TN38.

[13] Subcomm. on Oversight & Investigation Hearing, *supra* note 10, 1012-1024; 1131-1138; 2058-2064.

[14] U.S. H. COMM. ON THE JUDICIARY, MAJORITY STAFF REP., THE TRUMP ADMINISTRATION'S FAMILY SEPARATION POLICY: TRAUMA, DESTRUCTION, AND CHAOS 6 (Oct. 2020), https://perma.cc/4RY5-RN2B (hereinafter "House Report") (Secretary Kelly stated "Yes, I'm considering [that], in order to deter more movement along this terribly dangerous network. I am considering exactly that. [Children] will be well cared for as we deal with their parents.").

[15] HHS OIG REPORT I at 3, *supra* note 2, ("From July through November 2017, the El Paso sector of Customs and Border Protection (CBP), an agency within DHS, implemented new policies that resulted in 281 individuals in families being separated.").

U.S. Government used the pretext of criminal prosecution to facilitate its Family Separation Policy.  Under its Pilot Program, the U.S. Government prioritized the criminal prosecution of asylum seekers for improper entry into the United States.   The U.S. Government detained migrating parents under the custody of the U.S. Marshals Service based on criminal charges for unlawful entry and then forcibly took away their children. DHS then re-classified the children as unaccompanied minors and placed them in ORR custody.[16]  The U.S. Government separated approximately 280 families through the Pilot Program.[17]  The program did not contemplate or provide for the reunification of separated families at any stage.[18]  The U.S. Government not only failed to provide a mechanism to allow separated parents to find their children, it failed to even inform ORR of its new policy, or that the children sent to ORR shelters had been separated from the parents with whom they had arrived in the United States.[19]

36.     Stakeholders quickly denounced the U.S. Government's Pilot Program. DHS received numerous complaints through its Office of Civil Rights and Civil Liberties ("CRCL") which described the severe trauma caused by the separation of children from their parents and denounced the "needless cruelty" of these separations.[20]

37.     Officials inside and outside of the U.S. Government continued to voice concerns about the harmful effects of the Pilot Program even after it was terminated in

---

[16] *See, e.g.*, *United States v. Dominguez-Portillo*, No. 17-MJ-4409, 2018 WL 315759, at *1 (W.D. Tex. Jan. 5), *aff'd sub nom. United States v. Vasquez-Hernandez*, 314 F. Supp. 3d 744 (W.D. Tex. 2018), *aff'd*, 924 F.3d 164 (5th Cir. 2019).

[17] *See* DEP'T OF JUST., OFF. OF THE INSPECTOR GEN., REVIEW OF THE DEPARTMENT OF JUSTICE'S PLANNING AND IMPLEMENTATION OF ITS ZERO TOLERANCE POLICY AND ITS COORDINATION WITH THE DEPARTMENTS OF HOMELAND SECURITY AND HEALTH AND HUMAN SERVICES   15 (Jan. 2021), http://perma.cc/2JBA-59Q8 (hereinafter "DOJ OIG Report").

[18] *Id.* at 16.

[19] House Report at 7; *see also id.* app. C (emails from HHS inquiring why children arriving in their custody were claiming to have been separated from parents).

[20] House Report at 10; *see also id.* app. A (chart of 850 CRCL complaints, including over 200 that preceded the May 2018 implementation of the Family –Separation Policy across the Southern border).

9

2018.  Following the Pilot Program's termination, some U.S. Government officials publicly disavowed it because of the chaos and suffering it caused.  For example, following the briefing that he provided to DOJ policymakers about the Pilot Program, Acting U.S. Attorney John Bash thought "the idea [had been] abandoned" and would not be implemented nationwide.[21]

38.  On December 16, 2017, senior DOJ and DHS officials jointly prepared and reviewed a memorandum entitled, "Policy Options to Respond to Border Surge of Illegal Immigration."  The first section of the memorandum, called "Increase Prosecution of Family Unit Parents," recommended that CBP and ICE "work with DOJ to significantly increase the prosecution of family unit parents when they are encountered at the border," further noting "[t]he parents would be prosecuted for illegal entry (misdemeanor) or illegal reentry (felony) and the minors present with them would be placed in HHS custody."[22] The second section of the memo, titled "Separate Family Units," suggested "[a]nnounc[ing] that DHS is considering separating family units, placing the adults in adult detention, and placing the minors under the age of 18 in the custody of HHS as unaccompanied alien children (UACs)," and ordered "[o]nce legal coordination between DHS, HHS, and DOJ is complete, begin separating family units as stated above."[23]

39.  On April 6, 2018, the U.S. Attorney General announced a "Zero Tolerance Policy" that formally extended the practice of criminal prosecution and family separation first tested in the El Paso program to the entirety of the southern border.  In reviewing the program, the Office of the Inspector General for DHS concluded that the Zero Tolerance Policy "fundamentally changed DHS'[s] approach to immigration enforcement," which had previously not separated a child from an accompanying adult except in very limited

---

[21] DOJ OIG Report at 19.
[22] *Policy Options to Respond to Border Surge of Illegal Immigration* (Dec. 16, 2017), https://perma.cc/7KRZ-PXW7; *see* Anne Flaherty & Quinn Owen, *Leaked Memo Shows Trump Administration Weighed Separating Families at Border, Sen. Merkley Wants Nielsen Investigated for Perjury*, ABC NEWS (Jan. 18, 2019, 1:18 PM), https://perma.cc/6SVC-9Q3D.
[23] *Id.*

circumstances, such as where CBP determined that the adult was not the child's parent or guardian or posed a danger to the child.[24]

40.    In early May 2018, CBP told the Office of Management and Budget ("OMB") that the Zero Tolerance Policy would lead to the separation of more than 26,000 children from their parents between May and September 2018 alone.[25]

41.    Public comments by Trump administration officials show that they intended forcible separation of families under the Zero Tolerance Policy to terrify immigrant parents and children and thus deter future Central Americans from seeking asylum in the United States.

42.    For example, a December 16, 2017 DOJ and DHS memo stated that "prosecution of family unit parents" and "separat[ion] [of] family units . . . would be reported by the media and . . . have substantial deterrent effect[s]" on future migration.[26] On May 11, 2018, John Kelly, President Trump's then-Chief of Staff, stated that "a big name of the game is deterrence . . . It could be a tough deterrent—would be a tough deterrent," before adding that "[t]he children will be taken care of—put into foster care or whatever."[27] And Steve Wagner, Assistant Secretary of HHS, stated on June 19, 2018 that "[w]e expect that the new policy will result in a deterrence effect . . . ."[28] As the horrors of

---

[24] *See*, *e.g.*, OFF. OF INSPECTOR GEN., U.S. DEP'T OF HOMELAND SEC., OIG-18-84, SPECIAL REVIEW – INITIAL OBSERVATIONS REGARDING FAMILY SEPARATION ISSUES UNDER THE ZERO TOLERANCE POLICY 2 (Sept. 27, 2018), https://perma.cc/4E35-DQR5.

[25] OFF. OF INSPECTOR GEN., U.S. DEP'T OF HOMELAND SEC., OEI-20-06, DHS LACKED TECHNOLOGY NEEDED TO SUCCESSFULLY ACCOUNT FOR SEPARATED MIGRANT FAMILIES 17-18 (Nov. 25, 2019), https://perma.cc/GY3G-F8TG ("DHS OIG REPORT I").

[26] *Policy Options to Respond to Border Surge of Illegal Immigration* (Dec. 16, 2017), https://perma.cc/7KRZ-PXW7; *see* Anne Flaherty & Quinn Owen, *Leaked Memo Shows Trump Administration Weighed Separating Families at Border, Sen. Merkley Wants Nielsen Investigated for Perjury*, ABC NEWS (Jan. 18, 2019, 1:18 PM), https://perma.cc/6SVC-9Q3D.

[27] *Transcript: White House Chief of Staff John Kelly's Interview with NPR*, NPR (May 11, 2018, 11:36 AM), https://perma.cc/ZN5N-VN5R.

[28] Philip Bump, *Here Are the Administration Officials Who Have Said that Family Separation Is Meant as a Deterrent*, WASH. POST (June 19, 2018, 12:14 PM), https://perma.cc/LTB8-878Y.

family separation reached the public, President Trump insisted that he would not stop separating families unless lawmakers agreed to his immigration reform demands.[29]

43.     Despite the U.S. Government's claim that it would only separate families when parents were referred for prosecution for improper entry, in reality it separated many families who presented at official ports of entry seeking asylum (and thus were not subject to prosecution[30]), as well as families like Plaintiffs who crossed the border between ports of entry but were never criminally charged.[31]

44.     Contrary to its assertions, the U.S. Government did not apply its Zero Tolerance Policy evenhandedly but rather in a way that would cause the greatest trauma. CBP specifically targeted parents arriving with children over single adults when making criminal referrals to the DOJ.[32]

45.     During a six-week period between May 5, 2018 and June 20, 2018, at the height of the Zero Tolerance Policy, the U.S. Government separated at least 3,000 children from their parents.[33]

46.     In response to intense public criticism, President Trump issued an executive order on June 20, 2018 purporting to end the Family Separation Policy.[34]

---

[29] Michael Scherer & Josh Dawsey, *Trump cites as a negotiating tool his policy of separating immigrant children from their parents,* WASH. POST (June 5, 2018), https://www.washingtonpost.com/politics/trump-cites-as-a-negotiating-tool-his-policy-of-separating-immigrant-children-from-their-parents/2018/06/15/ade82b80-70b3-11e8-bf86-a2351b5ece99_story.html.

[30] *See L.*, 310 F. Supp. 3d at 1143 ("[T]he practice of family separation was occurring before the zero tolerance policy was announced, and that practice has resulted in the casual, if not deliberate, separation of families that lawfully present at the port of entry, not just those who cross into the country illegally.").

[31] DHS OIG Report I at 33.

[32] *See "Zero Tolerance" at the Border: Rhetoric vs. Reality*, TRAC IMMIGRATION (July 24, 2018), https://perma.cc/EK2Q-CJ7G.

[33] DOJ OIG Report at 43, https://perma.cc/2JBA-59Q8.

[34] Exec. Order No. 13841, Affording Congress an Opportunity to Address Family Separations, 83 Fed. Reg. 29,435 (June 25, 2018), *revoked*, Exec. Order No. 14011, 86 Fed. Reg. 8273 (Feb. 2, 2021).

47.     On June 26, 2018, Hon. Judge Sabraw of the U.S. District Court of the Southern District of California issued a preliminary injunction prohibiting the U.S. Government from separating parents from their children absent a finding of parental unfitness or danger to the child.[35]  The order required the U.S. Government to reunify children under age five with their parents within 14 days and children aged five and older within 30 days.[36]  Judge Sabraw held that the record reflected that the family separations at issue "have been agonizing for the parents who have endured them," and that when separating children from their parents, migrant children were "not accounted for with the same efficiency and accuracy as *property*."[37]

48.     Despite his executive order, President Trump continued to openly discuss the deterrence rationale for pursuing the Family Separation Policy even after the Zero Tolerance Policy had been formally ended, stating in December 2018 that "if you don't separate, FAR more people will come."[38]

**B.     The United States Forcibly Separated J.P. and L.C.**

**1.     J.P. and L.C. Seek Asylum in the United States**

49.     J.P. and L.C. fled to the U.S. just as the U.S. expanded its Family Separation Policy and were among its early victims.

50.     J.P. suffered severe domestic violence in Guatemala perpetrated by her husband.  She feared if she remained in her country, her husband would continue to harm or even kill her and that the U.S. Government of Guatemala would be both unwilling and

---

[35] *L.*, 310 F. Supp. 3d at 1149-50 (preliminary injunction).

[36] *Id.* at 1149.

[37] *Id.* at 1144, 1146 (emphasis in original).

[38] *See* Donald J. Trump (@realDonaldTrump), TWITTER (Dec. 16, 2018, 8:25 AM), https://perma.cc/4EMP-JC34; *see also* Fox News, *Interview: Maria Bartiromo Interviews Donald Trump on Fox Sunday Morning Futures*, YOUTUBE (Apr. 28, 2019), https://www.youtube.com/watch?v=hvUc7ONNTp4 at 1:32-2:21; Kimberly Kindy et al., *Trump says ending family separation practice was a 'disaster' that led to surge in border crossings*, WASH. POST (Apr. 28, 2019), https://www.washingtonpost.com/politics/trump-says-ending-family-separation-practice-was-a-disaster-that-led-to-surge-in-border-crossings/2019/04/28/73e9da14-69c8-11e9-a66d-a82d3f3d96d5_story.html.

1   unable to protect her.  L.C. also feared violence in Guatemala and chose to accompany her

2   mother to the United States.

3       51.    J.P. and then sixteen-year-old L.C. fled Guatemala on or around May 7,

4   2018.  It was the first time either J.P. or L.C. had left their small Mayan village.  J.P. spoke

5   only Q'eqchi', a Mayan language rarely spoken outside of Guatemala, and could not read

6   or write in any language.  Once she left her village, she was entirely dependent on her

7   daughter to communicate and to understand what was happening around her, as L.C.,

8   though she couldn't speak English, was able to speak in and understand Spanish.

9       52.    J.P. and L.C. endured an arduous nine-day journey to the United States.  They

10   lacked adequate access to food and water, and once they reached the U.S.-Mexico border,

11   men robbed them, taking what little money and possessions they carried.  J.P. and her

12   daughter entered the United States near Sans Luis, Arizona, on or around May 16, 2018.

13   **2.    J.P. and L.C. Are Taken into Custody by CBP**

14       53.    Shortly after crossing the border at San Luis, Arizona, J.P. and L.C. were

15   apprehended by CBP officers and transported to a Border Patrol station in Yuma, Arizona.

16       54.    After arriving late at night at the Yuma Border Patrol Station, CBP officers

17   placed J.P. and L.C. in a cold, windowless cell alongside about 100 other detainees.  There

18   were no beds, showers, or private toilets in the cell, and the lights were kept on 24 hours a

19   day.  Because there were no windows, J.P. and L.C. lost track of whether it was day or

20   night.  They received nothing to eat except lukewarm soup, and the only water available

21   was from the bathroom tap.  The cell was too crowded to allow J.P. or L.C. to lie down,

22   and they received only nylon blankets.  No one told J.P. nor L.C. when or if they would

23   be released.

24       55.    On May 17, 2018, CBP officers pulled J.P. aside to speak with her and

25   motioned to her to sign papers written in English.  The officer documented that J.P.'s native

26   language was Q'eqchi' and that she spoke little Spanish.  Unable to speak, read, or write

27   the English language, J.P. did not understand the papers she was given.  She wrote an "X"

28   on the signature line.

14

56.     L.C. was also interviewed by a CBP officer.  He questioned her without her mother's consent and outside of her mother's presence.

57.     While detained, J.P. and L.C. were stunned to witness CBP officers separating many children from their parents by force.  In one instance, they watched as two CBP officers grabbed and held a mother on either side as her son was forcibly taken from her by a third officer.  L.C. heard a CBP officer tell the woman in Spanish, "If you're such a good mother, why would you bring your child here?"[39]

58.     J.P. and L.C. had no idea where the separated children were being taken. They became terrified that they would also be separated.

### 3.     The U.S. Government Forcibly Separates J.P. and L.C.

59.     Around May 20, 2018, a CBP officer told L.C. she would be taken to a shelter for children that day.  L.C. became visibly upset, and after explaining to her mother what the CBP officer said, J.P. began to cry.

60.     When a CBP officer arrived to separate L.C. from her mother, L.C. became extremely distressed.  L.C. pleaded with the officer not to separate her from her mother, but the officer did not relent.

61.     While being pulled from her mother, L.C. fainted and fell face-first onto the concrete floor.  J.P. saw her daughter's face bleeding but was unable to come to her aid. This was the last contact J.P. had with her daughter.

62.     CBP officers did not assist J.P. in contacting her daughter.  J.P. had no way of knowing L.C.'s whereabouts or if she was seriously injured.

63.     J.P. was not able to make contact with her daughter until June 22, 2018, when she had retained counsel.

---

[39] This and all other verbal exchanges alleged in the complaint were in the Spanish language, unless otherwise noted.

### 4.   L.C. Is Placed In ORR Custody More Than 300 Miles Away From J.P.

64.   Due to her fall, L.C. suffered a painful gash to her lip that limited her ability to eat and speak over the following weeks.  She was taken to the emergency room at a nearby hospital while in immigration custody.  At the hospital, L.C. was given fluids and was told she would receive medication.  L.C. never received any such treatment.

65.   L.C. was then taken to Southwest Key Casa Phoenix, an immigrant children's shelter in Arizona, on May 20, 2018.  Five days after L.C. sustained the injury, L.C. reported continued swelling, bleeding, redness and scabbing.

66.   On or about May 25, 2018, L.C. was seen by a doctor to continue treatment for her lip injury. The doctor noted L.C. had developed a runny nose, nasal congestion, and a cough while in custody.  The doctor diagnosed L.C. with an acute upper respiratory infection, in addition to a bacterial skin infection, as a result of her lip injury.

67.   During the following eight weeks, L.C. cried daily over the separation from her mother, was unable to sleep, and prayed at night that she would see her mother again. She thought her mother had been taken away permanently and was worried that CBP officers did not know or care about J.P.'s language barriers.

68.   L.C. repeatedly asked for information about her mother's whereabouts.  An ORR official eventually informed L.C. that J.P. was somewhere in California, but no ORR shelter staff or DHS staff ever facilitated a phone call between L.C. and her mother.  The inability of L.C. to speak to her mother or hear her voice left her feeling abandoned.

### 5.   J.P. is Detained After Separation, is Linguistically Isolated, and Has No Information About L.C.'s Welfare.

69.   After CBP officers forcibly separated J.P. and L.C., J.P. spent approximately five more days[40] at the Border Patrol station, sleeping on the floor in a windowless room.

---

[40] J.P. lost track of the days during this period due to the lack of windows in the facility, her inability to communicate with those around her, and her distress after L.C. was separated from her.

16

70.     Without her child, J.P. fell apart.  She was heartbroken and cried constantly. She could not sleep because of the horrendous conditions of the facility and because she was so distraught.  CBP officials did not provide J.P. with any information about L.C.  J.P. was unable to ask anyone what had happened to her daughter, as none of the CBP officers spoke Q'eqchi', and she understood little of what she heard around her.

71.     After taking L.C. away, CBP officers transported J.P. to other facilities before finally transferring her to ICE custody at the Musick Detention Facility in Irvine, California.

72.     J.P. was never charged with any criminal offense.  She was placed in removal proceedings, but had no attorney at her initial court hearings and did not understand the immigration court process.

73.     During her time in Musick, J.P. constantly feared for L.C.'s safety and well-being.  J.P. suffered nightmares, woke up throughout the night, felt exhausted and hopeless, and felt sadness in her whole body.  Because of language barriers, she had no way to understand what might happen to her.  She saw women leave the detention center, but had no idea where they were being taken, or if she would be next.  She feared she would be deported, losing any chance to learn what became of L.C.

74.     With the assistance of a fellow detainee, J.P. submitted a request to ICE seeking information on her daughter's whereabouts.  J.P. received a written response several days later from ICE.  Lacking sufficient words in Spanish, and overwhelmed by her trauma, J.P. did not know how to find someone who could read and explain the response to her.  In any event, the written response only indicated where her daughter was detained and did not provide a telephone number or any other means to reach her daughter.  Nor did it indicate whether J.P. would be reunited with L.C.

75.     J.P. never received any verbal information in any language explaining where her daughter was detained or how she could reach her until she retained counsel around June 21, 2018.  Neither CBP, ICE officers, nor the Musick detention staff had ever facilitated interpretation to allow J.P. to her to communicate with her daughter.  To the

contrary, officers at the ICE facility yelled orders to J.P. in Spanish.   She seldom understood what was being said, and was terrified she would be punished for not doing as ordered.

76.   Once J.P. was represented by *pro bono* counsel on June 21, 2018, she finally learned that her daughter was in an ORR shelter in Arizona.  She was desperate to call her daughter—to hear her voice and confirm for herself that L.C. was safe.  But the Musick and ICE policies caused J.P. yet more agony as detention officers refused to connect her by phone with her daughter.  Ultimately, ICE staff provided a phone number for L.C., but required J.P. to put money into a telephonic account to make a call.  Until she had counsel, J.P. could not possibly have learned of the phone policies on her own, given her lack of literacy and the detention staff's failure to explain the phone policies or provide any other information to J.P. in her language.

77.   After extensive advocacy by her counsel, a detention officer finally facilitated a phone call between J.P. and L.C. on June 22, 2018.  The call was limited to fifteen minutes.  When J.P. and L.C. finally connected by telephone and heard each other's voice, they were overcome with emotion.  Once she could talk, L.C. asked when she would be reunited with her mother.  J.P. could not answer this question.

78.   During the next three weeks of their separation, J.P. and L.C. were only able to engage in minimal communication.  J.P. remained terrified she would be deported at her next immigration court hearing and forever lose track of L.C.

79.   On June 26, 2018, Judge Sabraw issued the preliminary injunction in the *L.* case and ordered the U.S. Government reunite families like J.P. and L.C. within thirty days.[41]

**6.   After Nearly Two Months, J.P. and L.C. Are Reunited**

80.   On July 13, 2018, Immigration Judge Carlos Maury ordered J.P. released on $1,500.00 bond.  Only after J.P. won her bond hearing, DHS released J.P. from Musick on

_____

[41] *L.*, 310 F. Supp. 3d at 1149.

July 16, 2018, approximately eight weeks after J.P. and L.C. had arrived in the United States and been separated.  That same day, ORR released L.C. from Casa Phoenix and facilitated her flight to Burbank, California, where her mother awaited her.

81.     Approximately fifty-seven days after the U.S. Government forcibly separated them, J.P. and L.C. were finally reunited late in the afternoon on July 16, 2018. Mother and daughter both were visibly emotional upon seeing one another and embraced.

82.     Shortly after reuniting, J.P. and L.C. moved to Florida where a sponsor supported them as they began to establish themselves in the United States and pursue their asylum claims.

83.     J.P. and L.C. were never charged with a crime, nor was J.P. found to be unfit to retain custody of L.C.

**7.     J.P. and L.C. Face the Effects of Separation**

84.     J.P. has suffered severe emotional distress as a result of her forcible separation from her daughter by the U.S. Government.  From the moment of separation, J.P. has felt the ongoing and lasting effects of extraordinary trauma.

85.     The clinical social worker who evaluated J.P. during her detention in Musick found that she exhibits symptoms consistent with Post-Traumatic Stress Disorder ("PTSD"), depression, and anxiety.

86.     J.P. continues to suffer as a result of the separation from her daughter.  J.P. has vivid memories of her time in custody and the pain and suffering she experienced after being separated from her daughter.  She has had difficulty concentrating on tasks and has been left with an enduring sadness.  J.P. is constantly nervous and cries frequently.  Even now, she has nightmares about the forced separation and her detention that make it difficult to sleep.

87.     L.C. experienced physical harm when she was taken from her mother, as well as fear and mental anguish.  After DHS separated L.C. and J.P., L.C. fainted, her face striking the floor. The injury caused L.C. great pain, making it difficult for her to eat or

speak.  During her time at Casa Phoenix, L.C. was diagnosed with a bacterial skin infection and an acute upper respiratory infection.

88.    After J.P. and L.C. were forcibly separated, L.C. was detained in an unfamiliar place, far from her mother.  She did not know what was happening or when she would see her mother again.  During this time, L.C. was extremely sad.  She has tried to forget everything that happened, but cannot.

89.    L.C. continues to often feel fear and worry, which is a source of ongoing stress and anxiety.  L.C. has vivid memories of her time in custody and the pain and suffering she experienced after being separated from her mother.  These memories and stress cause L.C. to experience regular headaches, which can lead to periods of extremely low energy and depression.

## CLAIMS FOR RELIEF

### COUNT I

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

90.    By engaging in the acts described in this Complaint, the federal officers and officials referenced above engaged in extreme and outrageous conduct with an intent to cause, or a reckless disregard of the probability of causing, Plaintiffs to suffer severe emotional distress.

91.    As a direct and proximate result of that conduct, Plaintiffs suffered severe emotional distress.

92.    Under the FTCA, the United States is liable to Plaintiffs for intentional infliction of emotional distress.

### COUNT II

### NEGLIGENCE

93.    The federal officers and officials referenced above had a duty to Plaintiffs to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs.

94.    By engaging in the acts alleged, the federal officers referenced above failed to act with ordinary care and breached their duty of care owed to Plaintiffs.

95.     As a direct and proximate result of the referenced conduct, Plaintiffs suffered substantial damages.

96.     Under the FTCA, the United States is liable to Plaintiffs for negligence.

## COUNT III

## ABUSE OF PROCESS

97.     In Arizona, the elements of an abuse-of-process claim are (1) a willful act in the use of a judicial process (2) for an ulterior purpose not proper in the regular conduct of the proceedings.  A defendant is liable for abuse of process when the process is used primarily to achieve a purpose for which it was not intended and can arise from all procedures incident to litigation.

98.     In Plaintiffs' case, the U.S. Government used its immigration detention authority which is incident to the judicial process of removal proceedings for the improper ulterior motive of separating families such as plaintiffs to generate publicity, and for the improper ulterior motive of deterring Plaintiffs from asserting their rights under U.S. and international law to seek asylum in the United States.

99.     Under the FTCA, the United States is liable to Plaintiffs for abuse of process.

## COUNT IV

## LOSS OF CONSORTIUM

100.    In Arizona, a loss-of-consortium claim requires proof of an underlying tort with a loss of society, companionship, care, support, and affection.  Arizona law recognizes both the child and the parent's right to assert such a claim.

101.    Both Plaintiffs suffered a loss of society, companionship, care, support, and affection as a result of Defendant's commission of the other torts alleged in this Complaint. For example, as a result of the U.S. Government's intentional infliction of emotional distress and abuse of process, both Plaintiffs were separated from a close family member, either a parent or child, while detained in a foreign country.  Under these circumstances, any person would seek familial companionship, care, support, and affection, yet Plaintiffs

21

could not because the U.S. Government confined J.P. and L.C. in different facilities from each other.

102.    The U.S. Government's negligence, which prevented families from communicating and slowed their reunification, also deprived Plaintiffs of the ability to seek comfort in each other.

103.    Even after reunification, the severe emotional trauma Plaintiff L.C., who was a child at the time, has suffered as a result of Defendant's actions has continued to impact her development and changed her profoundly, causing her to be withdrawn, fearful, and often crippled by anxiety.  The effect of the separation continues to deprive Plaintiff J.P. of society, companionship, care, support, and affection of her child, L.C.

104.    Similarly, Plaintiff J.P. has suffered symptoms of PTSD, depression and other emotional trauma as a result of the Defendant's actions.  The psychological harm J.P. suffered deprives Plaintiff L.C. of society, companionship, care, support, and affection of her parent where J.P.'s emotional distress has changed her profoundly.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request:

A.    Compensatory damages;

B.    Attorneys' fees and costs pursuant to, among other provisions, the Equal Access to Justice Act, 28 U.S.C. § 2412; and

C.    Such other and further relief as the Court deems just and appropriate.

**JURY TRIAL DEMAND**

Plaintiffs hereby demand a jury trial.

DATED this 25th day of April, 2022.

*/s/ Daniel B. Pasternak*
Daniel B. Pasternak
SQUIRE PATTON BOGGS (US) LLP
2325 East Camelback Road, Suite 700
Phoenix, AZ 85004
daniel.pasternak@squirepb.com

Manuel F. Cachán*
William C. Rose*
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
mcachan@proskauer.com
wrose@proskauer.com

Hena M. Vora*
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
hvora@proskauer.com

Sara Van Hofwegen*
Joel Frost-Tift*
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, CA 90005
svanhofwegen@publiccounsel.org
jfrost-tift@publiccounsel.org

*Attorneys for Plaintiffs*

*\* Pro hac vice applications forthcoming*